# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NICHOLAS LEANDRO RAMOS and MICHELLE REED,<br><br>Plaintiffs,<br><br>vs.<br><br>RANLIFE HOME LOANS, and RANLIFE, INC.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 2:20CV00896 DAK-DBP<br><br>Judge Dale A. Kimball<br>Magistrate Judge Dustin B. Pead |

This matter is before the court on Defendants RANLife Home Loans and RANLife, Inc.'s ("RANLife") Motion for Summary Judgment.[1] The court held oral argument on January 23, 2025. At the hearing, Matt W. Harrison represented RANLife, and James L. Harris represented Plaintiffs Nicholas Leandro Ramos ("Mr. Ramos") and Michelle Reed ("Ms. Reed"). At the conclusion of the hearing, the court took the matter under advisement. Now being fully informed, the court issues the following Memorandum Decision and Order, granting RANLife's Motion for Summary Judgment.

## BACKGROUND

Plaintiffs' Complaint alleges that they were subjected to hostile work environments based on their gender, religion, and on Mr. Ramos's sexual orientation. They also allege that RANLife discriminated against them based on their gender and religion, and they had no choice

---

[1] ECF No. 39.

1

but to resign their employment. RANLife disputes these claims and argues that both claims fail for a variety of reasons.

**UNDISPUTED FACTS**

RANLife is a mortgage company and residential lender located in Sandy, Utah. John Brown held the position of Training Department Manager and had responsibility for the interviewing, hiring, and initial training of new loan officer employees. He supervised loan officers who were either Level 1 Grant Coordinators or Level 2 Loan Officer Assistants. Mr. Brown was both Mr. Ramos's and Ms. Reed's manager while they were at Level 1 and Level 2. Once a loan officer reaches Level 3, they are assigned to a team.

Paul Greager became a Loan Officer at RANLife Home Loans in 2014. In or around September 2017, Mr. Greager received a promotion from the position of Senior Loan Officer to Training Manager. As a Loan Officer Manager, Mr. Greager did not have the authority to hire or fire employees, reassign them, substantially change their duties, or otherwise significantly affect the terms and conditions of their employment. Mr. Ramos and Ms. Reed were assigned to Mr. Greager's team once they became a Level 3 loan officer.

*RANLife's Policies*

RANLife's Human Resources Lead during Plaintiffs' employment, Shanna Paxton, had responsibility for providing training on sexual harassment, discrimination, and other RANLife policies. Ms. Paxton provided orientation to new employees during which she would explain RANLife's sexual harassment and discrimination policies, including that RANLife had a no-tolerance policy, how to report a complaint, and that RANLife would investigate all reports of harassment and discrimination. RANLife also regularly provided third-party sexual harassment

2

and discrimination training to its current employees, including training provided to employees on April 17, 2018, which both Mr. Ramos and Ms. Reed attended.

RANLife's discrimination policy explicitly prohibits any illegal harassment or retaliation, and contains the following language:

<u>No Harassment</u>

We prohibit harassment of one employee by another employee, supervisor, manager or third party for any reason based upon an individual's race, color, religion, genetic information, national origin, sex (including same sex), pregnancy, childbirth, or related medical conditions, age, disability or handicap, citizenship status, service member status, or any other category protected under federal, state, or local law. Violation of this policy will result disciplinary action, up to and including immediate discharge. If you have any questions about what constitutes harassing behavior or what conduct is prohibited by this policy, please discuss the questions with your immediate supervisor, manager or one of the contacts listed in this policy. At a minimum, the term "harassment" as used in this policy includes any of the following activities pertaining to an individual's race, color, religion, genetic information, national origin, sex (including same sex), pregnancy, childbirth, or related medical conditions, age, disability or handicap, citizenship status, service member status, or any other category protected by federal, state, or local law:

- Offensive remarks, comments, jokes, slurs, threats, or verbal conduct.

- Offensive pictures, drawings, photographs, figurines, writings, or other graphic images, conduct, or communications, including text messages, instant messages, websites, voicemails, social media postings, e-mails, faxes and copies.

- Offensive sexual remarks, sexual advances, or requests for sexual favors regardless of the gender of the individuals involved; and

- Offensive physical conduct, including touching and gestures, regardless of the gender of the individuals involved.

We also absolutely prohibit retaliation, which includes: threatening an individual or taking an adverse action against an individual for (1) reporting a possible violation of this policy, or (2) participating in an investigation conducted under this policy. . .
. . . If you have any concern that our No Harassment policy may have been violated by anyone, you must immediately report the matter. Due to the very serious nature of harassment, discrimination and retaliation, you must report your concerns to one of the individuals listed below:

3

    1.    First, go to your manager. If you are not satisfied after you speak with your manager or if you feel you cannot speak with your manager, discuss you concerns with Shanna Thatcher.

    2.    Secondly, discuss any concern with Shanna Thatcher, Human Resources Lead at 385-775-7529 and 9272 South 700 East, Sandy, UT 84070.

    3.    If you are not satisfied after you speak with Shanna Thatcher or if you feel that you cannot speak with Shanna Thatcher, discuss your concerns with Garr Smith, COO at 801-478-4517 and 9272 South 700 East, Sandy, UT 84070.

If an employee makes a report to any of these members of management and the manager either does not respond or does not respond in a manner the employee deems satisfactory or consistent with this policy, the employee is required to report this situation to one of the other members of management designated in this policy to receive complaints.

**<u>You should report any actions that you believe may violate our policy no matter how slight the actions may seem.</u>**

We will investigate the report and then take prompt, appropriate remedial action. The company will protect the confidentiality of employees reporting suspected violations to the extent possible consistent with our investigation.

**<u>You will not be penalized or retaliated against for reporting improper conduct, harassment, discrimination, retaliation, or other actions that you believe may violate this policy</u>**.[2]

Neither Mr. Ramos nor Ms. Reed disputes that they received these policies or that they attended at least one training regarding these policies.

*Plaintiff Nicholas Leandro Ramos*

Mr. Ramos began as a Level 1 Grant Coordinator on July 5, 2017. Before starting at RANLife, Mr. Ramos did not have any experience as a loan officer, in the mortgage or another loan industry, or any related experience. John Brown was Mr. Ramos's manager while he was at Level 1 and Level 2. Mr. Ramos became a Level 3 Loan Officer in February 2018 and Paul Greager became his supervisor.

---

[2] RANLife Harassment Policy (emphasis in original), attached as Exhibit D to Defs' Mot. for Summary Judgment, ECF No. 39-4.

Shortly after he became a Level 3 Loan Officer, Mr. Ramos told his previous manager, Mr. Brown, that Mr. Greager had called him an offensive nickname, a "fat, gay Clark Kent." Mr. Brown wanted Mr. Ramos to immediately report it to RANLife's human resources department. At Mr. Brown's urging, Mr. Ramos and Mr. Brown together met with Shanna Paxton, the Human Resources Lead. Mr. Ramos informed Ms. Paxton about the nickname given to him by Mr. Greager.

The meeting participants have different interpretations of what happened during this meeting, but the material facts are not in dispute. According to Ms. Paxton, she offered to intervene with Mr. Greager, including offering to bring him into the meeting to work things out. But Mr. Ramos admits that he "wanted to prevent Mr. Greager from becoming aware of the situation." Ms. Paxton also claims that she also offered to communicate with the CEO and CFO of RANLife about the situation but that Mr. Ramos insisted that he wanted to speak to Mr. Greager himself and work it out between them. Ms. Paxton also volunteered to talk to Mr. Greager with Mr. Brown, but Mr. Ramos feared that Mr. Greager did not like Mr. Brown, so he did not want that to happen. Ms. Paxton asked Mr. Ramos what response he'd like from RANLife, but he stated that he wanted to handle the situation himself.

Mr. Ramos, however, claims that Ms. Paxton put the burden on him to solve the problem, and he was panicked when Ms. Paxton wanted to bring Mr. Greager into the meeting to discuss the problem, which Mr. Ramos viewed as violating his confidentiality. He also believed it would lead to significant repercussions from Mr. Greager because Mr. Ramos believed that Mr. Greager had told employees on his team not to talk to other managers.  Mr.

Ramos contends that Ms. Paxton never made an offer to talk with the CEO or CFO, but he admits that he wanted to work it out himself and did not want Ms. Paxton to be involved.

Following the meeting, Mr. Brown spoke with Mr. Greager and informed Ms. Paxton that the conversation went well. Mr. Brown also followed up with Mr. Ramos about the situation, and Mr. Ramos informed him that things with Mr. Greager were fine. Mr. Ramos does not dispute that he told Mr. Brown that everything was fine but claims that he was afraid to discuss the situation with Mr. Brown and reported that everything was fine to prevent repercussions from Mr. Greager. After the meeting with Ms. Paxton, Mr. Ramos continued to work under Mr. Greager's supervision and never reported any additional issues or concerns with Mr. Greager's or any other employee's behavior.

The men on Mr. Greager's team at RANLife, including Mr. Ramos, would regularly joke and banter with one another and sometimes play inappropriate pranks on one another. While those comments were often off-color, sexual, and vulgar, the men on Mr. Greager's team all regularly participated in the banter (with one exception, Mr. Reyes), and there is no evidence that any of the team members complained about the banter and jokes.

In addition to calling Mr. Ramos a "fat, gay Clark Kent," Mr. Greager would make inappropriate sexual comments to Mr. Ramos, including comments about the founders of the LDS church. Mr. Greager stated that LDS church members were perverts and that Joseph Smith was a "horny pedophile." Mr. Greager made other homosexual references and innuendos regarding LDS church leaders. In addition, Mr. Greager would take Mr. Ramos's name plate off his desk and rub it inside Mr. Greager's pants on his genitals, and then throw it back to Mr. Ramos. Mr. Greager also made many inappropriate comments about women, including about

6

their breast size and other sexually charged banter. There is no dispute that Mr. Greager's comments and behavior were vile and completely inappropriate for a workplace.

It is undisputed, however, that Mr. Ramos regularly participated in the inappropriate banter and jokes. For example, he called Mr. Greager a "fat gay sailor," referencing Mr. Greager's service in the United States Marine Corps, he filled another employee's car with pornographic magazines, and he used profanity, including the "f" word with other employees at RANLife.

Mr. Ramos admits that after his first complaint about Mr. Greager, he never complained again, claiming that he believed that any further complaints would only result in retaliation. Mr. Ramos also claims that Defendants and other supervisors knew of Mr. Greager's behavior and did nothing to stop it, but Mr. Ramos has offered no admissible evidence to support this claim.[3] Mr. Ramos was the 2018 Rookie of the Year, and there is significant evidence that Mr. Greager gave significant support to Mr. Ramos, helping him to succeed as a Level 3 loan officer.

In April 2019, a recruiter from Guaranteed Rate Mortgage contacted Mr. Ramos, and Mr. Ramos resigned amicably from RANLife on or around May 2019. In his resignation letter, he

---

[3] Mr. Ramos makes one statement in his declaration that Ms. Paxton stated to him—during his meeting to complain about Mr. Greager's nickname for him—that "Paul's abusive behavior was well-known." *See* Ramos Decl., ECF 46-1 at paragraph 31. The court, however, finds this single self-serving statement to be too vague and unsubstantiated by others to create a disputed fact on this issue, particularly when Mr. Ramos's actual deposition testimony on this issue was different. Specifically, when asked if there was anything else that about Ms. Paxton that they hadn't discussed during the deposition, Mr. Ramos answered: "Just that she made her comment about, you know, 'That sounds like Paul,' which *seems* she's very aware of Paul's behavior." Ramos Depo., ECF No. 39-10 at page 75 of 181 (emphasis added). Moreover, Mr. Ramos has not demonstrated that Ms. Paxton's knowledge, as the Human Resources Lead, should be attributed to the company.

noted his appreciation for Mr. Greager as a manager and a friend and indicated that it had been a pleasure working at RANLife. He began working at Guaranteed Rate in June or July 2019. Mr. Ramos admitted that he left RANLife after he felt that he had enough experience to be successful somewhere else and that part of the reason he left RANLife was because he believed he could make more money working elsewhere.

*Plaintiff Michelle Reed*

Michelle Reed first began working for RANLife in 2013 as a Junior Processor. In 2018, Ms. Reed transferred from another position at RANLife to become a Level 1 Grant Coordinator, and she began training under Mr. Brown. Mr. Brown told Ms. Reed that he had concerns about her fit as a loan officer, based on the results of a personality assessment test that she had completed, but he was willing to allow her to work in that position.

Ms. Reed started on Mr. Greager's team just a few months after she began her loan officer training. Ms. Reed and Mr. Greager had been familiar with one another since he started at RANLife in 2014, and Ms. Reed worked as Mr. Greager's assistant while he was working as a loan officer, and before he became a manager. When Ms. Reed decided to become a loan officer, she asked Mr. Greager if she could be placed on his team once she finished her training. In Ms. Reed's experience, Mr. Greager was a hard worker and very successful as a loan officer, and she asked to be on his team because she felt that if she could learn from anyone, it would be him. When Ms. Reed became a Level 3 Loan Officer, and at her request, she was placed on Mr. Greager's team. On Mr. Greager's team, Ms. Reed excelled as a loan officer and became the fifth-best performing loan officer and top female loan officer at RANLife.

After Ms. Reed began working on Mr. Greager's team, another member of the team, Nick Caldwell, went through a difficult breakup. Mr. Greager mentioned to Ms. Reed that Mr. Caldwell could use another friend during that time. About a week later, however, Ms. Reed met with Mr. Greager and told him that she was uncomfortable being contacted by Mr. Caldwell. After Mr. Greager learned from Ms. Reed how uncomfortable she was, he did not put any more pressure on her to spend time with Mr. Caldwell, and he told Mr. Caldwell not to contact Mr. Reed. Despite not disputing these facts, Ms. Reed now claims that Mr. Greager was improperly pressuring her to date Mr. Caldwell.

Ms. Reed also claims that Mr. Greager would talk about women in the office, making comments about their breast size and about larger women and their bodies. She also claims that Mr. Greager talked with others about her weight and made fun of her eating habits, such as asking her why she bothered going to the gym when she ate so poorly. She contends that these types of comments were made "all the time." As a result, she claims that she sought a private office so that she was not subject to these comments. But there is also no dispute that she had previously expressed apprehension about talking on the phone in front of others and had, at times, been allowed to use her managers' private offices, when possible, to make phone calls.

But there were very few private offices available, and she claims that was forced to participate in a contest to earn the office because she was female. She offers no evidence, however, that the contest was implemented "because she was female." In any event, with Mr. Greager's continued support, she won the contest by a significant margin and received the private office.

On another occasion, Ms. Reed heard that there was a rumor going around that the reason she was doing so well as a Loan Officer was because she was sleeping with Mr. Greager. She claims that when she talked about this with Mr. Greager, he said, "It's lonely at the top. Get used to it." Although Ms. Reed now complains that Mr. Greager did not take any action in response to her concern, there is no indication that she was attempting to make a complaint about sexual harassment.

Before Ms. Reed departed from RANLife, Mr. Greager was unaware that Mr. Ramos had any complaints about harassment or discrimination. Ms. Reed never reported concerns about Mr. Greager to Ms. Paxton until approximately one or two days before she quit her employment with RANLife, on or around September 20, 2019. During her discussion with Ms. Paxton, she reported that Mr. Greager had engaged in conduct that she thought was hurtful and degrading.

In response, Ms. Paxton set up a meeting for Ms. Reed to meet with RANLife's CEO, Greg Walker, the next business day. Ms. Reed met Ms. Paxton and Mr. Walker the next Monday, and she provided the same information she had given Ms. Paxton. She also informed RANLife that she already had another job offer and was not interested in moving to another loan officer team. Except for these two meetings at the end of her employement, Ms. Reed never informed Ms. Paxton (or anyone else designated in the policy) of the other conduct she alleged in her charge of discrimination or her complaint. There is no dispute that Ms. Reed began considering new employment before deciding to resign and received a job offer while still working at RANLife. Ms. Reed started at Network Funding as a loan officer soon after.

Thus, except for Mr. Ramos's report to Ms. Paxton and Mr. Brown that Mr. Greager called him a "fat gay Clark Kent," Ms. Reed's complaints made to Ms. Paxton and Mr. Walker at the end of her employment were the first time that RANLife's had heard complaints of inappropriate comments, harassment, or discrimination of any kind by Mr. Greager.

## STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact.[5] "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6] Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7] The court's role "is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim."[8] When applying the summary-judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."[9] The court must grant summary

---

[4] Fed. R. Civ. Pro 56(a).
[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[6] *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016).
[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[8] *Foster v. Alliedsignal, Inc*. 293 F.3d 1187, 1195 (10th Cir. 2002).
[9] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

judgment on a claim if the party bearing the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[10]

## DISCUSSION

### *Hostile Work Environment Claims*

To survive summary judgment on a claim alleging a hostile work environment, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.[11] "The applicable test for a hostile work environment has both objective and subjective components. [This] dual standard asks both whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended," and both must be proved.[12]

First, because there is no genuine dispute that Mr. Ramos participated in jokes, banter, and behavior similar to Mr. Greager's, the court finds that no reasonable jury could find that Mr. Ramos was subjectively offended by Mr. Greager's comments and behaviors.[13] But even if this court assumes that Mr. Ramos and Ms. Reed have created sufficient factual disputes to allow a rational jury to find that their workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions

---

[10] *Celotex*, 477 U.S. at 322.
[11] *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957–58 (10th Cir. 2012)
[12] *Id.* (internal quotes and citations omitted).
[13] Mr. Ramos admits that he occasionally participated in this offensive conduct to "fit into the team," or that he engaged in some conduct at the suggestion of other employees, but these reasons do not help his claim.

of their employment and create an abusive working environment, their hostile work environment claims still fail.

To survive summary judgment on their hostile work environment claims, Plaintiffs must identify a basis for holding the employer liable under Title VII. The Supreme Court has stated that, under Title VII, "an employer's liability for [workplace] harassment may depend on the status of the harasser."[14] When the alleged harasser qualifies as a co-worker instead of a supervisor, "the employer is liable only if it was negligent in controlling working conditions."[15] That is, the harassment of the co-worker wasn't "made possible by abuse of supervisory power[,]"[16] and so different rules apply.[17]

The Supreme Court has defined the word supervisor—for the purposes of vicarious liability under Title VII—to include one who "is empowered by the employer to take tangible employment actions against the victim[.]"[18] A tangible employment action is "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"[19] And where a "harasser is empowered to effect significant changes in employment status

---

[14] *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).
[15] *Id.*
[16] *Helm v. Kansas*, 656 F.3d 1277, 1285 (10th Cir. 2011).
[17] *Vance*, 570 U.S. at 439 ("Negligence provides the better framework for evaluating an employer's liability when a harassing employee lacks the power to take tangible employment actions.").
[18] *Vance*, 570 U.S. at 424.
[19] *Id.* at 429 (quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).
*Ellerth*, 524 U.S. at 761).

indirectly through recommendations, performance evaluations, and the like, . . . the harasser may be a 'supervisor' under Title VII."[20]

RANLife has offered undisputed evidence that Mr. Greager, as a training manager, did not have any authority to hire or fire employees or otherwise significantly change their employment status. Mr. Greager also did not have the authority to reassign Plaintiffs to different responsibilities or make other decisions about their employment.  In this situation, where Mr. Greager was not a "supervisor," as defined by Title VII jurisprudence, a plaintiff can only "prevail by showing that his or her employer was negligent in failing to prevent harassment from taking place."[21]

"An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it."[22] Plaintiffs have not offered any evidence that RANLife knew or should have known about the conduct about which they have complained.[23] Therefore, Plaintiffs have not offered any facts to create a genuine dispute regarding wether RANLife was negligent in failing to prevent the alleged harassment by Mr. Greager.

Plaintiffs, however, have stated that Mr. Greager himself told them that he had the authority to fire them. Although this evidence is thin and neither party provided any analysis of any caselaw on this issue, the court, out of an abundance of caution, will consider whether Plaintiffs could survive summary judgment if Mr. Greager were considered to be a "supervisor," as that term is defined by Title VII case law.

---

[20] *Kramer*, 743 F.3d at 741.
[21] *Vance*, 570 U.S. at 449.
[22] *Ellerth,* 524 U.S. at 759.
[23] *See* footnote 3, above.

When the alleged harasser is a supervisor, an employer "can mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided."[24] As to the first prong, the Tenth Circuit has found that "distribution of a valid antiharassment policy provides compelling proof that an employer exercised reasonable care in preventing and promptly correcting sexual harassment."[25]

There is no dispute that RANLife's policies clearly define the prohibited conduct, including penalties that will be imposed for violations of those policies. They provide a method for clarification of the policy language, define what constitutes inappropriate behavior, and delineate specific inappropriate conduct. The policies also provide several methods for reporting inappropriate conduct, including reporting to a manager, human resources, or the COO, and provide the personal contact information for both the Human Resources Lead and the COO. Finally, the policies prohibit retaliation for making a complaint about inappropriate conduct and indicate that a report of such conduct will be investigated, and prompt remedial action will be taken. Both Ms. Reed and Mr. Ramos admit that they attended at least one training on harassment where these topics were addressed.

A defendant invoking the *Faragher/Ellerth* affirmative defense also must show "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective

---

[24] *Ellerth*, 524 U.S. at 759. This is often called the "*Faragher/Ellerth* affirmative defense."
[25] *Anderson v. Wintco Inc.*, 314 F. App'x 135, 139 (10th Cir. 2009)

opportunities provided by the employer or to avoid harm otherwise." [26] Additionally, "[a]n employer may satisfy the second element of the *Faragher/Ellerth* defense by showing that the victimized employee unreasonably delayed in reporting incidents of sexual harassment."[27]

The court finds that RANLife has demonstrated that both Plaintiffs unreasonably failed to take advantage of opportunities to prevent or correct the alleged harassment. RANLife provided Plaintiffs with the policies, including the manner in which harassment should be reported, at their new-employee orientations and/or trainings that were provided, and Plaintiffs had access to the no harassment policy.

At Mr. Brown's urging, Mr. Ramos reported an issue with the offensive nickname Mr. Greager used for him when he first became a Level 3 Loan Officer, but he declined the assistance offered by both RANLife's Human Resources Department. Although Mr. Ramos was appalled by Ms. Paxton's suggestion that they talk to Mr. Greager about his conduct, and insisted on handling the situation himself, Mr. Ramos's misunderstanding of how an investigation is conducted (i.e., talking to the alleged harasser) is unavailing. Even Mr. Ramos admits that Mr. Brown and Ms. Paxton "tried to assure me that there is no way that there could

---

[26] *Pinkerton v. Colo. Dep't of Trans.*, 563 F.3d 1052, 1061 (10th Cir. 2009) (quotation cleaned up).

[27] *Helm*, 656 F.3d at 1291. In *Pinkerton*, the Tenth Circuit held that the defendant had demonstrated plaintiff's failure when defendant "show[ed] a reporting delay of approximately two or two and a half months . . . for which [plaintiff] never offered any reason in her briefs on appeal." 563 F.3d 1052, 1063 (10th Cir. 2009); *see also Macias v. Southwest Cheese Co., LLC*, 181 F. Supp. 3d 883, 896 (D. N.M. 2016) (collecting cases and concluding delay of "roughly five months after the commencement of the alleged harassment" untimely). Thus, a plaintiff must make "'a concerted effort to inform the employer that a problem exists[.]'" *Pinkerton*, 563 F.3d at 1063 (quoting *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999)).

be any repercussions against me, that that wouldn't fly, but I knew otherwise."[28] It is undisputed that While Ms. Paxton was arguably obligated to investigate Mr. Ramos's complaint regardless of Mr. Ramos's insistence that he did not want her to, that issue is moot. It is undisputed that Mr. Brown talked to Mr. Greager about his inappropriate conduct and reported back to Ms. Paxton that the conversation went well.  When Mr. Brown followed up with Mr. Ramos, it is undisputed that Mr. Ramos said that everything with Mr. Greager was fine. If Mr. Ramos misrepresented the truth out of some vague and unsubstantiated fear of retaliation, he has still failed to take advantage of the corrective opportunities provided by the employer. There is no dispute that Mr. Ramos did not report the alleged harassment or otherwise request assistance again.

As demonstrated by her report about Mr. Greager as she was leaving RANLIfe, Ms. Reed also knew how to report harassment or discrimination. While her complaints were arguably untimely under the caselaw, Ms. Reed did eventually contact Human Resources but only after she had sought other employment and received an offer for a position with greater compensation than she had been receiving at RANLife. When she did speak with Mr. Walker and Ms. Paxton, days before quitting, she declined to stay at RANLife even after they indicated they would address her concerns and move her to another team.

Therefore, given the undisputed facts, the court finds that a reasonable jury could not find that RANLife failed to exercise reasonable care to prevent and promptly correct any harassing behavior, and a reasonable jury would find that Mr. Ramos and Ms. Reed unreasonably failed to take advantage of any preventive or corrective opportunities that were

---

[28] Ramos Depo., ECF No. 39-10 at page 71 of 181.

provided. Plaintiffs have failed to show any basis for holding RANLife liable for any alleged harassment.

***Discrimination Claims***

Plaintiffs also allege that RANLife discriminated against them based on their gender and religion in violation of Title VII, and they both claim they had no other choice but to resign their employment with RANLife. However, Plaintiffs' discrimination claims fail, as a matter of law, because neither Plaintiff has created a disputed fact about any adverse employment action.

Even taking all facts in the light most favorable to Plaintiffs, they cannot show that they were constructively discharged. "Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign."[29] To meet that burden, an employee must show that they "had no other choice but to quit."[30] Furthermore, their "subjective views of the situation are irrelevant;" Mr. Ramos and Ms. Reed must each show that "the conditions of employment were objectively intolerable.[31]

No reasonable jury could find that Mr. Ramos's or Ms. Reed's situation was so intolerable that a reasonable person would have felt compelled to resign. Both Ms. Reed and Mr. Ramos had various options they could have taken, throughout their employment, instead of quitting. For instance, RANLife's policies indicate that an employee should contact RANLife's COO or Human Resources to report harassment or discrimination. Mr. Ramos also admitted

---

[29] *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1318 (10th Cir. 2017) (citations and quotations omitted).
[30] *Id.*
[31] *Id.*

that he only left after he had been offered another position where he would receive a higher rate per loan than he did at RANLife. Even in the light most favorable to Mr. Ramos these facts show that his working conditions at RANLife were not intolerable, or that he had no choice but to quit his position. Ms. Reed could have transferred within the company and accepted a raise to stay, which she refused when offered by Mr. Walker before her resignation. Thus, Plaintiffs' claims of discrimination cannot survive summary judgment.

## CONCLUSION

Accordingly, for the foregoing reasons, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment [ ECF No. 39] is GRANTED, and Plaintiffs' action against RANLife is DISMISSED with prejudice.

DATED this 31st day of March 2025.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge